Per Curiam.

These appeals are presented to this court on the single record made before the Board of Tax Appeals in the taxpayer’s appeal there.
*276 It was the contention of the taxpayer before the Board of Tax Appeals that all the equipment under consideration was used directly in manufacturing or processing, and therefore exempt from taxation.
The record shows that near the site of the taxpayer’s operation, sand and two kinds of aggregates (fine and coarse) are stored in piles or mounds on the ground, where the aggregates are saturated with water by means of a sprinkling system. The moistened aggregates and sand are then lifted and transferred, as needed, in the clam shell bucket attached to the crane to an “aggregate” batching plant, where they are measured out in predetermined amounts and then discharged into a truck underneath the batching plant.
From the aggregate batching plant, the truck moves to a cement batching plant at which point cement is measured out in the required amount and placed in the truck with the aggregates; then from there the truck moves to the concrete mixer which produces raw concrete. This concrete is then distributed over the roadbed from a distributing bucket attached to the mixer. After being distributed, the concrete is worked by a spreader which operates to agitate the concrete to create an even texture. The flexi-finisher follows the spreaders, and behind them is a curing machine which further processes the concrete by im-pregnating the surface with a liquid membrane curing compound which makes the concrete dry and firm.
After these processes are completed, the concrete strip is sawed to an exact depth to cut fracture joints which are filled with a heated bituminous material to prevent irregular and random cracking of the concrete due to expansion and contraction.
The'taxpayer in its appeal contends that its processing or manufacturing begins with the water saturation of the piles of aggregates, claiming that it is necessary for efficient operation of the plant that the mix be wet before the cement is added, as otherwise the concrete would be too dry for use; that, therefore, all items used in the batching plant operations are exempt from sales tax; and that the Board of Tax Appeals should have exempted the machine crane, the clam shell bucket and the parts for the batchers, including therein the “cement elevator with screw conveyor and bucket” and other miscellaneous equipment.
*277 The Board of Tax Appeals applied the test established by this court in the syllabus of Youngstown Building Material & Fuel Co. v. Bowers, Tax Commr., 167 Ohio St., 363, 149 N. E. (2d), 1, which is as follows:
“In determining whether tangible personal property is used or consumed directly in the production of tangible personal property for sale by manufacturing or processing, and, therefore, whether its sale or use is excepted from taxation under the provisions of subdivision (E) (2) of Section 5739.01, or subdivision (C) (2) of Section 5741.01, Revised Code, the test is not whether such property is essential to the operation of an ‘integrated plant, ’ the test to be applied being, token does the actual manufacturing or processing activity begin and end, and is the property used or consumed during and in the manufacturing or processing period.”
The Board of Tax Appeals found “that the wetting of aggregates with water, prior to transportation by the crane and bucket to the weigh hopper or batching bin, does not constitute the beginning of the manufacturing or processing of concrete. The addition of the water to the aggregate does not transform or convert the aggregate into any different product nor into a different state or form from that in which it originally existed. * * * We are of the opinion that the mere addition of water to gravel does not constitute the start of processing or manufacturing of concrete and that the processing or manufacturing of concrete did not start until after the various raw materials were commingled in the body of the truck and dumped in the concrete mixer. It is our further opinion that the processing or manufacturing engaged in by appellant did not end until after the concrete was scored with the saw blades here in issue, and that all the equipment used in the forming and spreading of the concrete was used directly in processing concrete for sale.”
As to the major items, the crane, clam shell bucket, and cement elevator, the decision of the Board of Tax Appeals is also sustained by the decisions of this court in the following cases: Tri-State Asphalt Corp. v. Glander, Tax Commr., 152 Ohio St., 497, 90 N. E. (2d), 366; National Tube Co. v. Glander, Tax Commr., 157 Ohio St., 407, 105 N. E. (2d), 648; American Compressed Steel Corp. v. Peck, Tax Commr., 160 Ohio St., 207, 115 N. E. (2d), 153.
*278 The refusal of the Board of Tax Appeals to exempt the miscellaneous parts which the record shows were used in connection with the cement batching plant was governed by the Youngstown case, supra. In that case, bins to hold sand and stone which formed part of a batching plant were held taxable on the ground that they were used “prior to the commingling of the ingredients in the common weigh hopper.” In the instant cases, the cement batching plant was used prior to the commingling of the aggregates, sand and cement in the truck which conveyed the mixture to and deposited it in the chute leading to the concrete mixer. The similarity seems obvious.
Remaining for consideration is the appeal of the Tax Commissioner from that part of the decision of the Board of Tax Appeals holding the flexi-finisher, road forms, spreaders and saw blades exempt from the sales and use taxes because they were used directly in processing or manufacturing.
The Tax Commissioner argues that if the tangible personal property which the taxpayer produced was the concrete, it was fully processed and marketable by the time it was dumped on the ground, and the forms, spreaders, flexi-finisher and saw blades which were used to spread and finish the concrete into the road surface were used to produce a highway, which was affixed to the land as a permanent accession thereto.
This contention, if valid, would contradict the finding of the Board of Tax Appeals that “the processing or manufacturing engaged in by appellant did not end until after the concrete was scored with the saw blades.”
The record contains testimony that after the concrete is dumped and spread it has to be further treated by physical means to bring back to the surface the mortar and moisture in order to transform the rough irregular finish to a smooth even finish; that this is done by the flexi-finisher and spreáders, which agitate the fresh concrete by the transverse motion of ‘ ‘ screeds ’ ’ (in the Oxford English Dictionary — “a wooden straight edge used to smooth concrete”); and that, after the surface is smooth, it is treated with a curing compound and scored with saws. The record shows also that the concrete does not become so firmly affixed to the ground that it can not be removed for approximately 24 hours.
*279 The finding that the processing continues until the concrete is scored with saw blades within that period is also supported by credible testimony.
The court finding that the decision of the Board of Tax Appeals is neither unreasonable nor unlawful in any respect, a judgment of affirmance is rendered in each case.

Decision affirmed.

Weygandt, C. J., Zimmerman, Taft, Matthias, Bell, Herbert and Peck, JJ., concur.